# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

**QUAD/GRAPHICS, INC.,**
      Plaintiff,

v.                                                    Case No. 16-C-0033

**GCIU-EMPLOYER RETIREMENT FUND,**
      Defendant.

_____

## DECISION AND ORDER

Quad/Graphics, Inc. ("Quad") filed this action against the GCIU-Employer Retirement Fund ("the Fund"). Before me now is the Fund's motion to dismiss and its alternative motion to transfer venue to the Central District of California.

## I. BACKGROUND

This case involves the Multiemployer Pension Plan Amendments Act ("MPPAA"), which is an amendment to the Employee Retirement Income Security Act ("ERISA"). As its name suggests, the MPPAA governs multiemployer pension plans, which are plans that accept contributions from multiple employers and are usually maintained to fulfill the terms of collective bargaining agreements. *See Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for So. Cal.*, 508 U.S. 602, 605 (1993). The contributions of employers participating in the plans are pooled in a general fund available to pay any benefit obligation of the plan. *Id.* To receive benefits, an employee need not work for one employer for any particular continuous period. *Id.* at 605–06. Because service credit is portable, employees of an employer participating in the plan may receive credit for any work done for any participating employer. *Id.* at 606. An

1

employee obtains a vested right to benefits upon retirement after accruing a certain length of service for participating employers. *Id.*

In 1980, Congress enacted the MPPAA to strengthen ERISA's protections for multiemployer plans. One aspect of the MPPAA is its requirement that an employer pay "withdrawal liability" when withdrawing from a multiemployer plan. The purpose of this requirement is to ensure that the financial burden of the vested pension benefits of the withdrawing employer's employees will not be shifted to the other employers in the plan and, ultimately, to the Pension Benefit Guaranty Corporation, which insures such benefits. *Central States, Southeast and Southwest Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1371 (7th Cir. 1992).

The MPPAA provides a procedure for calculating and assessing withdrawal liability. *Concrete Pipe*, 508 U.S. at 609. For purposes of this case, it is not necessary to understand how withdrawal liability is calculated, other than to note that such liability is calculated by the pension plan's actuary and that the amount of the employer's liability will vary depending on the year in which the employer withdraws from the plan and on whether its withdrawal was "partial" or "complete." *Id.*; 29 U.S.C. §§ 1383 & 1385.

Once an employer withdraws from a plan, the plan must notify the employer of the amount of its withdrawal liability, furnish the employer with a schedule for paying that liability, and demand that the employer make payments in accordance with the schedule. *See* 29 U.S.C. § 1399(b)(1); *Concrete Pipe*, 508 U.S. at 610. If the employer disputes the plan's calculation of its withdrawal liability, it must follow the procedures specified in the MPPAA for challenging the calculation. Under these procedures, the employer and the plan must first attempt conciliation. 29 U.S.C. § 1399(b)(2); *Slotky*,

2

956 F.2d at 1371–72. If that fails, a party may demand arbitration. 29 U.S.C. § 1401(a)(1). Following arbitration, a party may obtain judicial review of the arbitrator's decision through an action in the district court to enforce, vacate, or modify the arbitrator's award. 29 U.S.C. § 1401(b)(2).

Importantly, the MPPAA provides that once a plan notifies an employer of its withdrawal liability and makes a demand for payment, the employer must immediately begin making payments in accordance with the schedule established by the plan, even if the employer disputes the plan's assessment and initiates arbitration. 29 U.S.C. §§ 1399(c)(2) & 1401(d). These payments are known as "interim payments," and the requirement to make them is sometimes described as being part of a "pay now, dispute later" scheme. *See Central States, Southeast and Southwest Areas Pension Fund v. Bomar Nat'l, Inc.*, 253 F.3d 1011, 1015 (7th Cir. 2001). If an employer fails to make interim payments, the plan can bring a collection action against the employer in federal court. *See* 29 U.S.C. § 1451; *Trs. of Chicago Truck Drivers, Helpers and Warehouse Workers Union Pension Fund v. Cent. Transp., Inc.*, 935 F.2d 114, 116 (7th Cir. 1991).

The present case arises out of the Fund's assessments of withdrawal liability against Quad. On July 2, 2010, Quad acquired another company, World Color (USA), which was formally known as Quebecor World (USA) Inc. Collective bargaining agreements between GCIU and Quebecor required Quebecor to contribute to the Fund. However, after Quad acquired Quebecor, employees at Quad's facility in Versailles, Kentucky voted to decertify GCIU as their bargaining representative, and Quad stopped making contributions to the Fund. On March 13, 2012, the Fund sent Quad a notice of partial withdrawal liability for the Versailles facility, and also a separate notice of complete withdrawal liability for Quad's other facilities. The notices stated that the

3

Versailles partial withdrawal occurred in 2010, and that the complete withdrawal of the remaining facilities occurred in 2011. On February 1, 2013, the Fund sent Quad a revised "notice and demand for payment" in which it assessed 2010 partial withdrawal liability for the Versailles facility at $93,194,558 (the "Versailles Assessment") and 2011 complete withdrawal liability for Quad's remaining facilities at $27,368,656 (the "2011 Assessment"). *See* Compl. Ex. B. As required by the MPPAA, Quad began making interim payments on these assessments.

Quad disputed both assessments. With respect to the Versailles Assessment, Quad argued that it continued to contribute to the Fund into 2011, and that therefore it did not partially withdraw in 2010. With respect to the 2011 Assessment, Quad agreed that it completely withdrew in 2011, but it disputed the Fund's calculation of the amount owed. Both of these disputes were submitted to arbitration.

On May 18, 2015, the arbitrator issued an "interim award." *See* Compl. Ex. C. In that award, the arbitrator stated that he agreed with Quad that the Versailles facility did not partially withdraw from the Fund until 2011, and that therefore Quad did not have partial withdrawal liability for 2010. The arbitrator ordered the Fund to rescind the Versailles Assessment. The arbitrator also ordered the Fund to "revise" the 2011 Assessment regarding Quad's complete withdrawal liability in a manner that was consistent with the arbitrator's conclusions in the interim award, which related to how payments for vacation benefits should be figured into the assessment. *Id.* at pp. 13–15.

On September 9, 2015, Quad filed an action against the Fund in the Central District of California to enforce the arbitrator's award as it related to the Versailles Assessment. However, because the arbitrator had classified its award as interim rather than final, the Fund argued that the suit was premature. In addition to moving to

4

dismiss the federal suit on this ground, the Fund asked the arbitrator to issue an order clarifying that the interim award was not final as to any issue. On October 27, 2015, the arbitrator granted the Fund's request and entered a "procedural order" in which he stated that the interim award was only tentative and was not final as to any issue that was subject to judicial review. *See* Fund's Request for Judicial Notice No. 1, ECF No. 18-1. The day after the arbitrator issued this order, Quad voluntarily dismissed the case it had filed in the Central District of California.

Meanwhile, the Fund understood the arbitrator's interim award to require the Fund to immediately prepare a reassessment of Quad's 2011 complete withdrawal liability. In order to carry out its obligations under the order, on November 12, 2015, the Fund sent Quad a "request for information" that asked Quad to provide the fund with information about its vacation pay contributions. *See* Compl. Ex. F. The Fund claimed it had the authority to issue this request for information under 29 U.S.C. § 1399(a), which is part of the MPPAA.

On November 16, 2015, the Fund filed a pleading in the arbitration entitled "Initial Revised Assessment of Quad/Graphics Inc.'s Withdrawal Liability." *See* Compl. Ex. E. The pleading, which was signed by the Fund's lawyer, explained that the reassessment incorporated "the Arbitrator's finding that the Fund used an improper methodology for determining the date on which a facility's obligation to contribute to a plan ceases." *Id.* The pleading stated that the revised assessment applies a "vacation deferral rule" consistently to all of the Quad facilities that have withdrawn. *Id.* The revised assessment provided that Quad incurred partial withdrawal liability in 2011 of $113,075,692 and complete withdrawal liability in 2012 of $94,453,492. The pleading concluded by stating that, in submitting the reassessment, the Fund was not accepting

5

the arbitrator's finding that the original assessments were done in error or waiving any right to challenge the arbitrator's findings following the issuance of a final award. *Id.* Attached to the pleading was a multi-page spreadsheet containing the details of how the Fund calculated the revised assessment. Quad refers to this pleading and the attached spreadsheet as the "2012 Assessment." *See* Compl. ¶ 5.

Unlike the Fund's original 2011 Assessment, the 2012 Assessment was not accompanied by a cover letter in which the Fund demanded that Quad make interim payments in accordance with the assessment. Nonetheless, Quad alleges in its complaint in the present action that the Fund has "demanded" that Quad make interim payments on the 2012 Assessment. Compl. ¶ 5. Quad does not, however, allege that the Fund took any action that could be construed as a demand for interim payments under the 2012 Assessment aside from its attorney's filing and serving the Assessment on Quad during the course of the arbitration. Quad continues to make interim payments under the 2011 Assessment and has no intention of stopping payments under that Assessment. Compl. ¶¶ 23 & 32.

Although Quad continues to make interim payments on the 2011 Assessment, it stopped making such payments on the Versailles Assessment shortly after the arbitrator issued the interim award finding that the Versailles facility did not partially withdraw in 2010. On January 6, 2016, the Fund initiated an action in the Central District of California to compel Quad to resume making interim payments under the Versailles Assessment. On March 24, 2016, the Fund amended its complaint in that action to add a claim for enforcement of the request for information it had issued to Quad in November 2015.

6

Case 2:16-cv-00033-LA    Filed 09/20/16    Page 6 of 12    Document 38

On January 8, 2016, Quad commenced the present action, which challenges the Fund's 2012 Assessment and its November 2015 request for information. Quad seeks a declaratory judgment providing that the 2012 Assessment is void and that Quad has no obligation to make interim payments on the Assessment. Quad offers several legal arguments in support of its claim that the 2012 Assessment is void: (1) that it was not an "employer" within the meaning of the MPPAA as of January 1, 2012; (2) that the Assessment's payment schedule violates ERISA; (3) that the Fund made the assessment only to discriminate against Quad for exercising its rights under ERISA; (4) that the Fund is judicially estopped from assessing withdrawal liability for 2012; and (5) that the 2012 Assessment violates Quad's due-process rights and constitutes a "taking" in violation of the Fifth Amendment to the Constitution. Quad also seeks a declaratory judgment providing that Quad has no obligation to respond to the Fund's November 2015 request for information. Quad's legal argument in support of this claim is that because it was no longer an "employer" within the meaning of the MPPAA as of the date on which the request for information was made, it cannot be compelled to respond.

On February 3, 2016, the Fund responded to Quad's complaint by filing a motion to dismiss. Although the Fund raises a number of grounds for dismissal, its principal argument is that Quad's request for declaratory relief with respect to the 2012 Assessment is not ripe, as the Fund has not demanded that Quad make payments under that Assessment but instead submitted that Assessment to the arbitrator only to facilitate the arbitration. As an alternative to its motion to dismiss, the Fund seeks an order transferring venue to the Central District of California.

On March 8, 2016, after the Fund filed its motion to dismiss in the present case, the arbitrator ordered the Fund to file a "finalized revision" of its assessment of Quad's

7

withdrawal liability. *See* ECF No. 27 at p. 5 of 36. On March 17, 2016, in compliance with this order, the Fund filed another pleading in the arbitration in which it attached spreadsheets and other details regarding its assessment of Quad's complete withdrawal liability. *Id.* at p. 8–36. This document is similar in form to the 2012 Assessment and supersedes that Assessment. As it did with the 2012 Assessment, the Fund stated in the pleading that it was not accepting the arbitrator's finding that the original assessments were done in error or waiving any right to challenge the arbitrator's findings following the issuance of a final award. The Fund added that it was "making no demand for interim payments under these assessments" but instead maintained "that Quad has a continuing duty to make payments on the Fund's original assessment dated February 1, 2013." *Id.* at p. 9.

As far as the record reveals, the parties continue to arbitrate their dispute over Quad's withdrawal liability, and Quad continues to make interim payments under the original 2011 Assessment. Also, the Fund's lawsuit in the Central District of California for collection of interim payments under the Versailles Assessment and for enforcement of the request for information remains pending.

## II. DISCUSSION

Quad's lawsuit seeks two forms of relief: (1) a declaratory judgment stating that the Fund's 2012 Assessment, which the Fund last revised on March 17, 2016, is invalid, and that therefore Quad has no obligation to make interim payments under that Assessment, and (2) a declaratory judgment stating that the request for information that the Fund served on Quad in November 2015 is also invalid and therefore Quad has no obligation to respond to it. For the reasons stated below, I conclude that Quad's challenge to the 2012 Assessment does not present a live case or controversy.

Although Quad's challenge to the request for information does present a live case or controversy, that challenge is the mirror image of the Fund's action to enforce the request for information, which is pending in the Central District of California. Because courts normally decline to hear requests for declaratory relief when there is a mirror-image claim for "coercive" relief pending, I will decline to hear Quad's request for declaratory relief concerning the request for information. Because my decisions on these two issues dispose of this case, I will not consider the Fund's other grounds for dismissal or its motion to transfer venue.

**A. Quad's Challenge to the 2012 Assessment**

Article III of the U.S. Constitution limits the authority of the federal courts to "cases or controversies." *Rock Energy Co-op. v. Vill. of Rockton*, 614 F.3d 745, 748 (7th Cir. 2010). From that requirement flow two closely related concepts: ripeness and standing. *Id.* Both of these doctrines bar a plaintiff from asserting an injury that depends on so many future events that a judicial opinion would be advice about remote contingencies. *Id.* Focusing particularly on suits for declaratory relief, the Supreme Court has explained that courts must look at "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).

In the present case, it is clear that there is no immediate controversy between Quad and the Fund regarding interim payments under the 2012 Assessment. As discussed above, the Fund prepared that Assessment as part of the pending arbitration, has made no demand on Quad for interim payments under the 2012 Assessment, and has expressly stated that it is not demanding that Quad make interim payments under

9

that Assessment.  Rather, when the Fund filed the most recent version of the 2012 Assessment with the arbitrator, the Fund stated that its position was that Quad must make interim payments under the original 2011 Assessment, which Quad continues to do, rather than under any version of the 2012 Assessment.  In this suit, Quad does not dispute that it must make interim payments under the 2011 Assessment.  Therefore, there is no live case or controversy concerning interim payments: both Quad and the Fund agree that Quad must continue to make interim payments under the 2011 Assessment rather than the 2012 Assessment.[1]

Quad contends that this suit presents a live dispute because the Fund could change its mind and demand interim payments under the 2012 Assessment "at its whim."  Br. in Opp. at 15, ECF No. 21.  However, the mere possibility that the Fund might change its mind does not give rise to a dispute with sufficient immediacy to warrant the exercise of federal jurisdiction.  See Rock Energy, 614 F.3d at 748–49.  Quad has pointed to no facts suggesting that the Fund has any intention of seeking interim payments under the 2012 Assessment at any time, much less that it plans to do so soon.  To the contrary, the Fund contends that the arbitrator's interim award was mistaken, that the 2011 Assessment is the correct Assessment, and that Quad must continue to make payments under that Assessment.  Moreover, Quad has not shown that the mere filing of the 2012 Assessment in the arbitration "is having a present concrete, adverse, and irremediable effect on [Quad's] day-to-day affairs."  Id. at 749.  Rather, it appears that if and when the Fund demands payment under the 2012

---

[1] Although Quad stopped making interim payments under the Versailles Assessment, and there appears to be a live dispute between the parties as to whether it is liable for such payments, Quad does not in this suit seek relief in connection with the Versailles Assessment.  See Br. in Opp. at 10, ECF No. 21.

10

that Assessment.  Rather, when the Fund filed the most recent version of the 2012 Assessment with the arbitrator, the Fund stated that its position was that Quad must make interim payments under the original 2011 Assessment, which Quad continues to do, rather than under any version of the 2012 Assessment.  In this suit, Quad does not dispute that it must make interim payments under the 2011 Assessment.  Therefore, there is no live case or controversy concerning interim payments: both Quad and the Fund agree that Quad must continue to make interim payments under the 2011 Assessment rather than the 2012 Assessment.[1]

Quad contends that this suit presents a live dispute because the Fund could change its mind and demand interim payments under the 2012 Assessment "at its whim."  Br. in Opp. at 15, ECF No. 21.  However, the mere possibility that the Fund might change its mind does not give rise to a dispute with sufficient immediacy to warrant the exercise of federal jurisdiction.  See Rock Energy, 614 F.3d at 748–49.  Quad has pointed to no facts suggesting that the Fund has any intention of seeking interim payments under the 2012 Assessment at any time, much less that it plans to do so soon.  To the contrary, the Fund contends that the arbitrator's interim award was mistaken, that the 2011 Assessment is the correct Assessment, and that Quad must continue to make payments under that Assessment.  Moreover, Quad has not shown that the mere filing of the 2012 Assessment in the arbitration "is having a present concrete, adverse, and irremediable effect on [Quad's] day-to-day affairs."  Id. at 749.  Rather, it appears that if and when the Fund demands payment under the 2012

---

[1] Although Quad stopped making interim payments under the Versailles Assessment, and there appears to be a live dispute between the parties as to whether it is liable for such payments, Quad does not in this suit seek relief in connection with the Versailles Assessment.  See Br. in Opp. at 10, ECF No. 21.

10

Assessment, Quad will at that time be able to seek declaratory relief or any other form of relief that may be warranted.

Accordingly, Quad's claims for declaratory relief in connection with the 2012 Assessment will be dismissed for want of an actual case or controversy.

**B. Quad's Challenge to the November 2015 Request for Information**

Unlike Quad's request for declaratory relief in connection with the 2012 Assessment, Quad's request for declaratory relief in connection with the November 2015 request for information is ripe: the Fund contends that Quad must immediately respond to the request, while Quad contends that the request is invalid and that it has no obligation to respond. However, the Fund included a claim to enforce the request for information in its amended complaint in the Central District of California. Quad concedes that this claim is the mirror image of its claim for declaratory relief here. *See* Resp. to Request for Judicial Notice ¶ 4, ECF No. 31 (stating that the second count in the Fund's amended complaint "mirrors" Quad's request for declaratory relief). A federal court has discretion to decline to hear a case seeking declaratory relief, and it ordinarily will decline to hear such a case when a "mirror-image action seeking coercive [*i.e.*, non-declaratory] relief" is pending in another court. *Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 980 (7th Cir. 2010). In this situation, the court will "ordinarily give priority to the coercive action, regardless of which case was filed first." *Id.* In accordance with this rule, I will decline to hear Quad's claim for declaratory relief concerning the request for information. That claim may be litigated as part of the Fund's coercive action pending in the Central District of California.

## III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the Fund's motion to dismiss is **GRANTED IN PART**. The motion is granted insofar as Quad's claims concerning the 2012 Assessment are dismissed without prejudice for want of an actual case or controversy, and its claim concerning the November 2015 request for information is dismissed without prejudice in favor of the coercive action pending in the Central District of California. In all other respects, the motion is denied, although I express no view on the merits of the Fund's other grounds for dismissal.

**IT IS FURTHER ORDERED** that the Fund's alternative motion to transfer this case to the Central District of California is **DENIED** as **MOOT**.

**IT IS FURTHER ORDERED** that the Fund's motion to file a supplemental request for judicial notice is **GRANTED**.

**FINALLY, IT IS ORDERED** that the Clerk of Court shall enter final judgment.

Dated at Milwaukee, Wisconsin, this 20th day of September, 2016.

s/ Lynn Adelman
_____
LYNN ADELMAN
District Judge